UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X

ROBERT and SUSAN VIOLA, parents of Z.V.,:          **ECF CASE**
A Disabled Student,
                                        :          04 Civ. 8874 (WCC)
                        Plaintiffs,
                                        :
            - against -                             **OPINION**
                                        :          **AND ORDER**
ARLINGTON CENTRAL SCHOOL DISTRICT,
                                        :
                        Defendant.
                                        :
- - - - - - - - - - - - - - - - - - - - - X


**A P P E A R A N C E S :**

                                FAMILY ADVOCATES, INC.
                                **Attorneys for Plaintiffs**
                                209 Clinton Avenue
                                Kingston, New York  12401

ROSALEE CHARPENTIER, ESQ.

        Of Counsel


                                KUNTZ, SPAGNUOLO, SCAPOLI
                                  & SCHIRO, P.C.
                                **Attorneys for Defendant**
                                Route 22, Hunting Ridge Mall
                                P.O. Box 396
                                Bedford Village, NY 10506

JEFFREY J. SCHIRO, ESQ.

        Of Counsel

**CONNER, Senior D.J.:**

Plaintiffs Robert and Susan Viola bring this action on behalf of their minor child, Z.V., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.*, against defendant Arlington Central School District (the "District") for review of a decision by the State Review Officer ("SRO") for the New York State Education Department's Office of State Review affirming the decision of an impartial hearing officer ("IHO") that declined to award tuition reimbursement for plaintiffs' unilateral placement of Z.V. at a private school for dyslexic children for the 2003-04 school year.[1]  Defendant now moves for summary judgment affirming the SRO's decision and dismissing the parents' claim for tuition reimbursement.  Plaintiffs cross-move for summary judgment for an order declaring both their election of private school over public school and their choice of the Kildonan School ("Kildonan") proper under the IDEA, as well as for an order directing tuition reimbursement and payment of reasonable attorney's fees.  For the reasons set forth below, the Court grants defendant's motion for summary judgment, and denies as moot plaintiffs' motion for summary judgment.

## BACKGROUND

The administrative record and the additional evidence submitted by both parties reveals the following factual background.[2]  At the time of the hearing, Z.V. was a ten-year-old boy attending

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i).

[2] The record before this Court consists of: the transcript of the hearing before the IHO, as reviewed by the SRO; the exhibits before the SRO, including defendant's seventy-one numbered exhibits denominated "Ex. 1-71," respectively, plaintiffs' three lettered exhibits denominated "Ex. A-C," respectively, and four exhibits from the IHO hearing denominated "IHO 1-4," respectively;

fifth grade at Kildonan, a private school specializing in teaching students with dyslexia.  (SRO Op.

at 1.)  Z.V. was born on November 5, 1993, and as a young child suffered frequent ear and

respiratory infections, recurrent strep throat and a respiratory airway disorder, all of which resolved

over time.  (Hr'g Tr. at 661-64; Ex. 3 at 1; Ex. 58 at 2.)  Z.V. attended preschool during the 1997-98

academic year, where the teacher noted a problem with Z.V.'s fine motor skills, i.e. difficulty using

scissors, buttoning his sweater, tying his shoes.  (Hr'g Tr. at 665.)  The following year, Z.V. entered

kindergarten at Traver Road Primary School ("Traver Road") in the District, where, due to reading

difficulties, he was enrolled in an early intervention reading support program.  (*Id.* at 668.)  As part

of that program, Z.V. received reading support three times per week and used the Waterford

Program, a computer-based early literacy tool.  (Ex. 58 at 1.)  Z.V. attended summer school after

kindergarten before starting first grade at Traver Road in Fall 1999.  (*Id.*)

During first grade, Z.V. received individual reading support outside the classroom five days

a week; individual reading and math instruction in the classroom twice a week; and daily, in-class

small group reading instruction.  (*Id.*; Hr'g Tr. at 670.)  Mid-way through first grade, Z.V. initially

was evaluated to determine whether he had a learning disability.  (Hr'g Tr. at 680.)  Z.V. underwent

three days of psychoeducational evaluation in March and May of 2000 in addition to an occupational

therapy screening.  (Exs. 58, 60.)  The occupational therapy screening revealed inconsistent letter

and number formation as well as difficulty with organization skills; the therapist's screening report

---

the affidavit of Barbara J. Donegan, Assistant Superintendent for Pupil Personnel Services for the
District; and the affidavit of Robert A. Lane, Ed.D, Academic Dean of Kildonan.  The hearing before
the IHO was held over four days in 2003 (October 15, October 24, November 13 and November 24)
and three days in 2004 (January 7, March 3 and March 4).  The transcript of the hearing is
consecutively paginated—with the exception of the transcript of the January 7 hearing, which this
Court has taken the liberty of renumbering—and our citations thereto are undated.

provided a list of "supportive activities" to address these problems. (Ex. 60.) The psychoeducational evaluation included a number of different tests designed to assess intelligence and visual-motor ability. The Wechsler Intelligence Scale for Children–Third Edition ("WISC–III") yielded a verbal IQ score of 90 (25th percentile) and a performance IQ score of 75 (5th percentile); the full scale IQ score of 81 (10th percentile, low average range) was considered "meaningless" because of the large 15-point discrepancy between the verbal and performance IQ scores. (Ex. 58 at 2-3 & App. A; SRO Op. at 2.) These results suggested "uneven cognitive functioning." (*Id.* at 3, 4.) The Beery-Buktenica Development Test of Visual-Motor Integration showed scores in the average range, "though minimally so," for visual perception, visual-motor integration and motor coordination. (Ex. 58 at 3, 4 & App. B.) Finally, on the Woodcock-Johnson Revised Tests of Achievement ("Woodcock-Johnson") Z.V. achieved a Broad Reading score of 67 (1st percentile), a Broad Math score of 78 (7th percentile) and a Broad Written Language score of 74 (4th percentile). (*Id.* at 3-4, 9-11.) These scores revealed a "great deal of between subtest variability . . . with standard scores ranging from Very Low to Superior." (*Id.* at 3.) Behavioral testing "indicated a great deal of inattentive behavior both in school and at home." (*Id.* at 5.)

The report recommended that Z.V.'s parents share the test results with Z.V.'s pediatrician, Dr. Daniel Aronzon, M.D., so that he might address Z.V.'s attention problems. (*Id.*) After reviewing the test results, Dr. Aronzon diagnosed Z.V. with attention deficit hyperactivity disorder ("ADHD") and prescribed Aderol. (Hr'g Tr. at 683, 689, 693.) The report also recommended that the District's Committee on Special Education ("CSE") convene to consider classifying Z.V. "as a student with a learning disability (reading, writing, math)." (Ex. 58 at 5.) The CSE met on August 29, 2000, just before the start of Z.V.'s second-grade year at Traver Road, and recommended that

Z.V. be classified as learning disabled.  (Ex. 54; Hr'g Tr. 138, 684, 686.)  At that same meeting, the CSE established Z.V.'s individualized education program ("IEP") for the 2000-01 academic year. It indicated placement in a "12:1+1" special class for two hours each day to be held at Traver Road.[3] (Ex. 53 at 1.)  The CSE also noted the need to approve an occupational therapy evaluation (*id.*), a need it reiterated and actually approved in its modified IEP of December 7, 2000.  (Ex. 49 at 9.) Mrs. Viola declined the occupational therapy evaluation "as she has noticed improvement which she thinks may be due to [Z.V.'s] medication."  (*Id.*)  Mrs. Viola testified before the IHO that Z.V.'s second grade special education teacher told her that occupational therapy services were not needed. (Hr'g Tr. at 691-92.)   At Mrs. Viola's request, the CSE elected to reconsider the need for the evaluation in Spring 2001.  (Ex. 49 at 9.)  During the December 7, 2000 CSE meeting, the IEP was revised to include an extra hour of special class time each day.  (*Id.* at 1.)  Both of the CSE meeting minutes reflected the Committee's knowledge that Z.V. was diagnosed with attention deficit disorder ("ADD").[4]  (Exs. 49, 53.)

Near the end of second grade, the Woodcock-Johnson was readministered.  Z.V. achieved a Broad Reading score of 88 (21st percentile), a Broad Math score of 100 (50th percentile) and a Broad Written Language score of 94 (34th percentile).  (Ex. 47 at 1-2.)  According to Christopher Bayer, Supervisor of Special Education for the District and chairperson of the District's CSE, these

---

[3] The term "12:1+1" refers to a ratio of twelve students to one teacher plus one teacher's assistant.  (Hr'g Tr. at 87.)

[4] According to Mrs. Viola, Dr. Aronzon diagnosed Z.V. with ADHD. There are three subtypes of ADHD generally recognized by medical professionals, of which ADD is the "predominately inattentive type." ADD is also an outdated term used to describe the entire disorder. *See* http://www.nimh.nih.gov.  While this distinction is ultimately of no relevance to this Court's opinion, we note that the record includes both terms without distinguishing between them; only Exhibit 24 indicates the subtype as ADD.

scores demonstrate "marked increases in progress on the achievement testing in a couple of areas." (Hr'g Tr. at 130.)

On May 31, 2001, the CSE conducted Z.V.'s annual review and formulated the 2001-02 IEP for Z.V.'s upcoming third-grade year at West Road Elementary School. (*Id.* at 126, 697-98; Ex. 43.) The CSE recommended continuing the 12:1+1 special class instruction, reduced by thirty minutes to 2.5 hours each day in order to add thirty minutes of resource room instruction each day. (Ex. 43 at 1.) It also reapproved the occupational therapy evaluation, originally postponed upon Mrs. Viola's request, in order to "provide more information concerning his fine motor ability" (*id.* at 9), and allowed for testing modifications, including extended testing time. (*Id.* at 2.)

On June 15, 2001, therapist Toby Rutberg conducted the occupational therapy evaluation. Rutberg concluded that Z.V. demonstrated delays in his visual perceptual skills, has decreased handwriting legibility and has difficulties with motor planning and bilateral coordination. (Ex. 42 at 2.) Specifically, test results revealed Z.V. had difficulty writing upper and lower case letters from memory, poor letter formation and confusion of upper and lower case letters. (*Id.* at 1-2.) Z.V.'s writing speed was on par or above other third graders. (*Id.* at 2.) The composite score of the Developmental Test of Visual Perception, which assesses several components of visual perception ability through a series of subtests, put Z.V.'s overall performance and his perceptual skill performance in the poor range. (*Id.*) Rutberg recommended Z.V. receive occupational therapy twice a week for thirty minutes a session with one session conducted on an individual basis outside the classroom and the other conducted in a group setting in the classroom. (*Id.*)

In July 2001, Mrs. Viola received a telephone call from the District referring Z.V. to Dr. Aleksandra Alderman, M.D., a pediatric psychiatrist who regularly examines learning disabled

students to review occupational and physical therapy evaluations for the District. (Hr'g Tr. 119-20, 699.) Dr. Alderman examined Z.V. on August 24, 2001, and supported Rutberg's recommendations. (Ex. 39 at 4.) In her evaluation, under the "Teachers [sic] Impressions" section, Dr. Alderman noted that Z.V. prints backwards and maintains poor legibility. (*Id.* at 1.) Dr. Alderman's examination found Z.V.'s letter formation inconsistent, poor in quality and performed with increased effort, and that Z.V. had difficulty in coding that appeared to interfere with his letter formation. (*Id.* at 3.)

In October, on Dr. Aronzon's referral, Z.V. underwent additional testing at the Center for Communication Disorders at St. Francis Hospital and Health Center. (Hr'g Tr. at 703.) These tests were independently arranged upon the suggestion of Dr. Aronzon, and were not based upon any recommendation by the CSE. (*Id.*) The audiological evaluation showed Z.V. had hearing within normal limits, but suggested possible inadequate Eustachian tube functioning resulting from negative pressure in the right ear. (Ex. 38.) The speech-language evaluation showed "severe writing deficiencies given his chronological age" as well as "severe deficits in the ability to follow multi-step directions presented aloud." (Ex. 37 at 2.) This evaluation recommended four to six months of outpatient therapy one to two times a week, possible support services in school and central auditory testing. (*Id.* at 2, 3.)

The central auditory testing occurred on November 7, 2001 at the Center for Communication Disorders, again by referral from Dr. Aronzon. (Ex. 31.) Unlike the audiological test, which tests basic hearing ability, the central auditory test is designed to determine whether there is an auditory processing problem caused by something other than hearing loss. (Hr'g Tr. 117-18.) Testing confirmed Z.V.'s right ear Eustachian tube problem, indicated that Z.V. has difficulty processing sounds when background noise is present and identified an auditory processing disorder impacting

Z.V.'s speech-sound processing ability. (*Id.* at 1-3.) Recommendations included therapy; preferential classroom seating; use of remedial techniques to improve short-term memory; decoding and auditory closure skills; use of visual aids; and use of an FM auditory trainer, which is designed to eliminate background noise by transmitting a teacher's voice directly into a student's ear. (*Id.* at 3-4; Hr'g Tr. 99.)

The CSE convened on November 9, 2001, the first of what would be three meetings during the 2001-02 school year, to modify Z.V.'s IEP based on the occupational therapy evaluation it had before it. The CSE adjusted the IEP to incorporate Rutberg's recommendation and set forth specific goals and objectives to address Z.V.'s problems. (Ex. 34 at 1, 8-10.) The CSE convened again on January 11, 2002 to further modify Z.V.'s IEP based on the audiological, speech and central auditory processing test results it received after the previous CSE meeting. This IEP discontinued the resource room service, returned Z.V.'s 12:1+1 special class time to three hours daily and added individual speech/language therapy once a week for thirty minutes to be held in a special location. (Ex. 28 at 1.) The IEP also listed goals and objectives geared to address Z.V.'s auditory deficiencies. (*Id.* at 11.) Lastly, the IEP included approval for use of an FM auditory trainer. (*Id.* at 1, 12; Ex. 27.) The CSE convened once again on February 25, 2002 to add an additional, individual, thirty minute speech/language session to Z.V.'s weekly schedule.[5] (Ex. 26 at 1, 13.)

Z.V.'s annual occupational therapy review was conducted on March 5, 2002. Rutberg

---

[5] In October 2001, Dr. Aronzon referred Z.V. to Dr. Higgins, M.D., for a neurological consult. (Hr'g Tr. at 708.) Dr. Higgins diagnosed Z.V. with dyslexia, attention deficit disorder and a visual processing disorder. (*Id.* at 709.) He switched Z.V. from Aderol to Concerta and referred Z.V. to Dr. Simone Collymore, Ph.D., for a neuropsychological evaluation. (*Id.* at 709-10.) The CSE did not have Dr. Collymore's evaluation before it during this succession of meetings, nor is there any indication that the CSE ever was made aware of Dr. Higgin's diagnosis.

concluded that Z.V. "made steady progress this year" based on scores from various legibility tests and a handwriting speed test, and recommended a continuation of Z.V.'s established occupational therapy services. (Ex. 25 at 1, 2.)

Following this evaluation, on March 30, 2002, Z.V. underwent an independent neuropsychological evaluation conducted by Dr. Collymore. (*See supra* note 5.) During this evaluation, which took place over the course of seven days (Hr'g Tr. at 714), Z.V. repeated a number of intelligence and achievement tests previously administered in both first and second grade in addition to a host of other diagnostic tests. Readministration of the WISC–III produced a verbal IQ score of 110 (75th percentile), a performance IQ score of 89 (23rd percentile) and a full scale IQ score of 99 (47th percentile, average range). (Ex. 25 at 2.) This reflected improvements on most of the subtests, a possible result of familiarity with the test (*id.*), but "results compared to earlier testing indicated a significantly wider discrepancy between verbal and performance scores." (SRO Op. at 4.) Results from readministration of the Woodcock-Johnson yielded a Broad Reading score of 83 (13th percentile), a Broad Math score of 84 (14th percentile) and a Broad Written Language score of 80 (9th percentile). (Ex. 25 at 12-13.)

Dr. Collymore concluded that achievement testing showed "poorly developed basic reading, spelling and arithmetic skills," and that some of Z.V.'s "difficulty is due to a diminished capacity in processing visual information." (*Id.* at 7.) Dr. Collymore's report continued:

> Reading speed and accuracy are significantly lower than that expected based on [Z.V.'s] aptitude and age. As such, a diagnosis of reading disorder, which appears to be primarily due to visuospatial difficulties (visual dyslexia) is also warranted. . . . Qualitatively, there was a significant behavioral difference noted between the sessions in which [Z.V.] had received [Concerta] and the one instance[] in which he had not. . . . Thus, . . . a diagnosis of ADHD, primarily inattentive type also seems appropriate.

(*Id.* at 8.) Dr. Collymore found continued special education extremely important and recommended an inclusion setting; speech/language therapy; a multimodal approach focusing on segmenting and integrating visual, auditory and other sensory modalities in the reading process; a multisensory approach in the writing process; use of a computer with a word processor; use of audio books; testing accommodations; continued medication; and individual psychotherapy, among others. (*Id.* at 10-11.)

On August 16, 2002, the CSE met to conduct Z.V.'s annual review and design his IEP for his upcoming 2002-03 fourth-grade year. (Hr'g Tr. at 86-87.) The IEP continued Z.V.'s 12:1+1 special class, occupational therapy and speech/language therapy at the same frequency as the February 25, 2002 IEP. (Ex. 20 at 1.) In addition, the CSE "approved a Functional Behavior Assessment and a Positive Support Plan in order to develop greater consistency with how to approach [Z.V.'s] educational and attentional difficulties." (*Id.* at 4.) The CSE also set another meeting, to take place within the first month of the school year, to review Z.V.'s performance and to accommodate, at Mrs. Viola's request, the attendance of Tom Rowley, Z.V.'s private tutor.[6] (*Id.*)

That meeting took place on September 20, 2002. (Ex. 14 at 1.) While the IEP remained unchanged, discussions among the CSE and Z.V.'s teachers, private tutor and mother addressed Z.V.'s behavioral difficulties. A communication log and/or email system was to be developed to aid communication among the District's teachers, the private tutor and Z.V.'s parents. (*Id.* at 4.) Also, the CSE agreed to schedule a meeting among the teachers to develop the Functional Behavior Assessment and Positive Support Plan approved at the previous CSE meeting. (*Id.*) A behavioral

---

[6] Tom Rowley, a private tutor with a company known as The Finish Line, was hired by Mrs. Viola in July 2000, and tutored Z.V. until January 2003, when the cost became too great for the Violas to bear. (Hr'g Tr. 719, 728.)

specialist also was scheduled to observe Z.V. in the classroom to assist the team in development of its plans. (*Id.*) The CSE proceeded to review, upon Mrs. Viola's request, each of the recommendations set forth in Dr. Collymore's report. It was agreed that most of the recommendations could be supported by Z.V.'s regular and special education teachers, and that assistive technology devices would not be implemented until later. (*Id.*) When the CSE raised the possibility of counseling, one of Dr. Collymore's recommendations, the minutes reflect that Mrs. Viola did not want Z.V. to attend counseling on top of his other services since it might "overwhelm" him. (*Id.*) The CSE agreed to reconvene in November 2002 "to review his progress as well as the positive support plan that will be developed with [Z.V.'s] team." (*Id.*)

This next CSE meeting took place on December 17, 2002. (Ex. 10 at 1.) There was some adjustment to Z.V.'s testing modifications in anticipation of the upcoming English-Language Arts test (*id.* at 4; Hr'g Tr. 72), and the CSE approved an assistive technology evaluation. (Ex. 10 at 4.) Although at the previous meeting the CSE intended to schedule a meeting to create the Positive Support Plan, the CSE again stated only that Z.V.'s teachers will develop one. No additional CSE meetings were scheduled before the next annual review in May 2003.

The assistive technology evaluation approved by the CSE was conducted on February 25, 2003. The evaluation recommended that Z.V. continue to practice handwriting rather than learn to avoid the process by typing (Ex. 6 at 2-3); trial use of an on-screen keyboard program to determine whether typing would "reduce [Z.V.'s] cognitive load and increase his production of written material" (*id.* at 3.); and use of a talking word processor and spellchecker to increase Z.V.'s word processing skills. (*Id.*).

Z.V.'s annual occupational therapy review was submitted on April 15, 2003. Unlike the

previous annual review, no formal testing was done to gauge Z.V.'s progress. The report noted Z.V. exhibited continued deficiency in fine motor and visual motor/perceptual skills, which caused decreased handwriting legibility, poor letter formation, poor word alignment and handwriting speed below age level expectations. (Ex. 7.) According to Rutberg's testimony, Z.V. was making "slow progress" (Hr'g Tr. at 379), but was "below average." (*Id.* at 405.) Rutberg recommended a continuation of Z.V.'s existing occupational therapy schedule. (Ex. 7.)

Over the course of seven days in April and May 2003, a speech/language reevaluation was completed. Testing found the majority of Z.V.'s speech/language scores within normal limits, but noted "relative weakness in the areas of sentence formulation, naming items in a given category, and rapid naming of pictured symbols/colors/objects." (Ex. 8 at 2.) The evaluation recommended group speech/language therapy two times per week for thirty minutes a session. (*Id.*)

Also in May 2003, the Woodcock-Johnson was readministered.[7] The results "revealed a further decline in subtest scores for Broad Reading (standard score 79, 8th percentile), Broad Math (standard score 72, 3rd percentile) and Broad Written Language (standard score 78, 7th percentile) (*see* Exhibits 4, 61)." (SRO Op. at 4; Complt. ¶ 29.)

The CSE convened on May 16, 2003 to conduct Z.V.'s annual review and to prepare the IEP for Z.V.'s upcoming fifth-grade year. The IEP continued Z.V.'s special class and occupational therapy sessions as set in the previous IEP. (Ex. 4 at 1.) It also continued Z.V.'s speech/language therapy, although it was modified from individual therapy to group therapy. (*Id.*) Testing

---

[7] The results were contained in an "Academic Update" submitted by Z.V.'s special education teacher, dated May 19, 2003 and attached as page 5 of the CSE reevaluation, dated three days prior. According to the Complaint, the District administered the test on May 7, 2003; at the hearing, a date of May 12, 2003 was given.

modifications allowed calculator use and accommodations for upcoming unit, final and State exams. (*Id.* at 2.)  In addition, a Positive Reinforcement Plan was instituted and assistive technology device recommendations were approved for purchase.  (*Id.*)  Goals and objectives were designed to address the issues raised by the most recent speech/language evaluation.  (*Id.* at 8-9.)  Lastly, the CSE approved a special education summer program, a service the Violas declined.  (*Id.* at 1, 5.)

According to Mrs. Viola, she informed the CSE by letter dated May 21, 2003 that Z.V. would be receiving another neuropsychological evaluation by Dr. Marian Rissenberg, Ph.D., and requested full reimbursement from the District.[8]  (Hr'g Tr. at 778.)  That evaluation was conducted in June 2003, and included a wide array of tests.  Testing under the WISC–III yielded a verbal IQ score of 99 (47th percentile), a performance IQ score of 90 (25th percentile) and a full scale IQ score of 94 (34th percentile).  (Ex. 3 at 18.)  Dr. Rissenberg concluded that Z.V. had "a specific developmental visuospatial learning disability, or processing deficit, and Asperger's syndrome."  (*Id.* at 11.)  Under the "Recommendations" section, Dr. Rissenberg wrote Z.V. "has a very severe visuospatial processing deficit and will require a truly multisensory . . . instructional approach in a total immersion setting, such as a day school program for children with dyslexia."  (*Id.*)

Mrs. Viola stated that she mailed a copy of Dr. Rissenberg's report to the District in August. (Hr'g Tr. at 793.)  Bayer, the CSE chairperson, testified that the CSE received the letter in August (*id.* at 58), but that it was received in conjunction with a letter, dated August 17, 2003, requesting

---

[8] Bayer, the CSE chairperson, testified that the CSE approved Mrs. Viola's request.  (Hr'g Tr. at 59.)  Mrs. Viola stated that Z.V. was reevaluated by Dr. Rissenberg because "[w]e didn't understand why with Dr. Collymore's . . . recommendations and the support that the CSE was going to reinforce based on her recommendations why [Z.V.] was steadily going backward in our eyes." (Hr'g Tr. at 949-50.)  Upon questioning, she also testified that this evaluation was used for the Kildonan application.  (*Id.* at 950.)

an impartial hearing seeking tuition reimbursement for Z.V.'s attendance at Kildonan due to the District's alleged failure to supply an appropriate IEP for the 2003-04 academic year. (*Id.* at 58, 60; IHO Ex. 4.) The District mailed the IEP on August 28, 2003. (Hr'g Tr. at 31-32.) The Violas received it on or around September 5, 2003, two days after the school year began. (*Id.* at 32, 794.)

The IHO rendered his decision on April 20, 2004 upholding the appropriateness of the IEP and denying plaintiffs' request for reimbursement after seven days of hearings beginning on October 15, 2003 and ending on March 4, 2004. This decision was affirmed by the SRO in an opinion dated July 9, 2004. Plaintiffs filed their Complaint with this Court on November 9, 2004 challenging the decision.

## DISCUSSION

I.  <u>Governing Law</u>

A.  <u>Purpose of the IDEA</u>

Congress enacted the IDEA to promote the education of children with disabilities. *See*, *e.g.*, *Schaffer v. Weast*, No. 04-698, 126 S.Ct. 528, 2005 WL 3028015, at *2 (Nov. 14, 2005); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998). Under the IDEA, to receive federal funding a state must, among other things, provide all disabled children with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). Such a "free appropriate public education" must include "'special education and related services' tailored to meet the unique needs of a particular child, . . . and be 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 122 (citations omitted) (quoting 20 U.S.C. § 1401(a)(18) (current version at 20 U.S.C. § 1401(9)) and *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 207 (1982)). "Because the law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, 20 U.S.C. § 1412(a)(5), special education and related services must be provided in the least restrictive setting consistent with a child's needs." *Walczak*, 142 F.3d at 122. "Nevertheless, the IDEA permits education in more segregated settings such as dedicated special education classrooms, the home, hospitals and private institutions 'when the nature or severity of a child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'" *Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (Conner, J.) (quoting *Walczak*, 142 F.3d at 122 (internal citations and quotations omitted)).

If a "state receiving IDEA funding fails to give a disabled child a [free appropriate public education], the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2d Cir. 2000), *cert. denied*, 532 U.S. 942 (2001). A court may award tuition reimbursement where (1) the proposed IEP was inadequate to afford the child an appropriate public education, and (2) the private education services obtained by the parents were appropriate to the child's needs. *See id.* (quoting *Walczak*, 142 F.3d at 129). However, the IDEA required only that districts give disabled students a "'basic floor of opportunity . . . consisting of access to specialized institutions and related services which are individually designed to provide educational benefit.'" *Watson v. Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 144 (N.D.N.Y. 2004) (quoting *Rowley*, 458 U.S. at 201); *see also M.B. v. Arlington Cent. Sch. Dist.*, No. 99 Civ. 9973, 2002 WL 389151, at *3 (S.D.N.Y. Mar. 12, 2002) ("Congress intended the Act 'to open the door of

public education to handicapped children on appropriate terms,' not 'to guarantee any particular level of education once inside.'" (quoting *Rowley*, 458 U.S. at 192)).

## B.    Use of Individualized Educational Programs

The "centerpiece of the statute's education delivery system" is the IEP, an educational program tailored to provide appropriate educational benefits to individual disabled students. *Weast*, 2005 WL 3028015, at *2; *Honig v. Doe*, 484 U.S. 305, 311 (1988). Under the IDEA, a written IEP establishing "[t]he particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually." *Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1414(a)(5) (current version at 20 U.S.C. § 1414(d)(4)(A)(i))). Specifically, the IEP must state:

> (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

*Id.* The IDEA requires that the IEP be developed by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Id.*

Parents dissatisfied with a proposed IEP may contest it at an "impartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by the local school board. *See* N.Y. EDUC. LAW § 4404(1). The IHO's decision may be appealed to the state educational agency, *see* 20 U.S.C. § 1415(g), and the state educational agency's decision may in turn be appealed in either state or federal court, *see id.* § 1415(i)(2)(a). According to a recent Supreme Court decision affecting the burden of proof in IDEA actions, "[t]he burden of proof in an administrative hearing challenging an IEP is

properly placed upon the party seeking relief." *Weast*, 2005 WL 3028015, at *8. This Court can only assume, then, that the same party bears the burden throughout any judicial appeals process, and consequently bears the burden of proving by a preponderance of the evidence that: (1) the school district complied with IDEA procedural requirements; and (2) the IEP is reasonably calculated to confer educational benefits on the student. *See O'Shea*, 353 F. Supp. 2d at 454.


C.   **Standard of Federal Judicial Review**

IDEA actions in federal court generally are resolved by examination of the administrative record in a summary judgment procedural posture. *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003). An IDEA action, however, differs from an ordinary summary judgment motion because the existence of a disputed issue of material fact will not defeat the motion. *Id.* Rather, "[f]ederal courts reviewing administrative determinations under the IDEA must base their decisions on 'the preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003). The Second Circuit has emphasized that both it and the "Supreme Court . . . have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." *Id.* at 380-81 (citing *Rowley*, 458 U.S. at 204-08; *Walczak*, 142 F.3d at 129). Thus, although our inquiry certainly is not one of "'rubber stamp'" review, *M.S. ex rel. S.S.*, 231 F.3d at 100, we nevertheless "must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Grim*, 346 F.3d at 381 (quoting *Walczak*, 142 F.3d at 129).

In reviewing the SRO's determination, we must engage in a two-part inquiry: (1) whether the state has complied with the IDEA's procedures; and (2) if the state has so complied, whether the IEP is "'reasonably calculated'" to bestow educational benefits. *Id.* (quoting *Rowley*, 458 U.S. at 206-07 (footnote omitted)). As stated above, the party seeking relief bears the burden of satisfying both prongs of this inquiry by a preponderance of the evidence. *See Weast*, 2005 WL 3028015, at *8. In line with the Supreme Court's newly imposed burden ruling, if we conclude that the "proposed IEP was inadequate to afford the child an appropriate public education [and] that the private education services obtained by the parents were appropriate to the child's needs," we may enter an award reimbursing the parents for the expenses that they incurred with respect to the private placement. *Walczak*, 142 F.3d at 129 (citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)).

## II.    Analysis

### A.    Procedural Requirements

Plaintiffs allege the District committed three procedural violations. Specifically, the District violated the IDEA's procedures by: (1) failing to complete an annual review of goal achievement prior to formation of the most recent IEP thereby effectively excluding the parents from meaningful participation; (2) failing to measure progress in accordance with the criteria set forth in the IEP; and (3) relying on improper opinions expressed by the special education teacher.

"The initial procedural inquiry is no mere formality." *Walczak*, 142 F.3d at 129. Rather, "the formality of the Act's procedures is itself a safeguard against arbitrary or erroneous decisionmaking." *Evans v. Bd. of Educ. of the Rhinebeck Cent. Sch. Dist.*, 930 F. Supp. 83, 93 (S.D.N.Y. 1996)

(internal quotations omitted). "The importance Congress attached to these procedural safeguards cannot be gainsaid," especially since the Supreme Court noted that "adequate compliance with the procedures proscribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 205, 206. However, not every procedural error will render an IEP "legally inadequate." *Grim*, 346 F.3d at 381.

### 1.     Meaningful Participation

Addressing the first alleged procedural violation, this Court finds, in line with the SRO's decision, that Z.V.'s parents meaningfully participated in the May 16, 2003 CSE meeting. Indeed, the facts establish a history of cooperation and coordination among the CSE, Z.V.'s individual teachers and Z.V.'s parents regarding Z.V.'s education.

The IDEA ensures proper parental input through, *inter alia*,

[an] opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.

*Cerra v. Pawling Cent. Sch. Dist.,* No. 04-5370-CV, 2005 WL 2381962, at *5 (2d Cir. Sept. 28, 2005) (quoting 20 U.S.C. § 1415(b)(1)). Plaintiffs contend that "the District defeated the very purpose of the IEP" by completing the annual review of Z.V.'s goal mastery after the CSE met, and that this delay prevented the parents from meaningfully participating in developing the IEP by depriving them of crucial information. (Pls. Mem. Opp. Supp. Mot. Summ. J. at 7-8.) Apparently, Z.V.'s annual academic update report was not completed until May 19, 2003. That report contained the results of Z.V.'s May 2003 Woodcock-Johnson, which reflected declining test scores, and

included comments from Z.V.'s special education teacher noting that Z.V. had "deficits in most academic areas" and required "strengthening in all academic areas."[9] (Ex. 61 at 5; Complt. ¶ 32.) In addition, plaintiffs allege that the District did not send the 2002-03 "Progress Report for IEP Goals and Objectives" to Z.V.'s parents until June 1, 2003, thereby depriving them of that information. (Complt. ¶ 33.)

Regardless, there is no indication that this information was unknown to the District CSE members or Z.V.'s parents at the time of the May 16 meeting. (SRO Op. at 7.) Z.V.'s special education teacher, regular education teacher, speech therapist and parents, among others, attended the CSE meeting in question, which was specifically focused on developing Z.V.'s IEP for the upcoming academic year.[10] (Ex. 4 at 5); *see Cerra*, 2005 WL 2381962, at *6 (approving SRO's finding that parents were "significantly involved" in developing the IEP "as evidenced by" participation in CSE meetings). Mrs. Viola admitted that she and Mr. Viola were verbally informed of the information contained in the June 1 Progress Report at the meeting. (*Id.* at 784.) This is consistent with Bayer's testimony. "The CSE chairperson testified that at the CSE meeting the special education teacher provided a summary report on progress towards goals and objectives, and that while the meeting was in progress the chairperson entered this information into a data base for

---

[9] While this report appears to have been signed on May 19, 2003, it is contained in a CSE reevaluation dated May 16, 2003. However, the Court notes that included in the CSE reevaluation is a "Psychological Functioning" form supplied by the school psychologist dated May 16, 2003 that lists the scores from the March 30, 2002 WISC–III as the currently available testing information, rather than the scores listed in the May 19, 2003 report.

[10] Z.V.'s special education teacher testified that she, Z.V.'s private tutor, his regular education teacher and Mrs. Viola "worked as a very strong team to make sure that [Z.V.'s] academic goals were addressed and his social [abilities] and self-esteem [were] reinforced" and communicated regularly through both oral and written channels. (Hr'g Tr. at 300.)

the student on a laptop computer." (SRO Op. at 7 (citing Hr'g Tr. at 213).) Bayer also stated that the Woodcock-Johnson scores from the most recent administration of the test were before the CSE. (Hr'g Tr. 41-42.) In addition, referencing the CSE meetings generally, Z.V.'s regular education teacher, Elizabeth Coppola, indicated that test scores were regularly stated and their meaning explained. (*Id.* at 536.)

Plaintiffs also allege they were effectively excluded from meaningfully participating because they did not receive the fourth quarter report on Z.V. prior to the CSE meeting. This cannot amount to a violation of IDEA procedure because, as the fourth quarter was not yet complete, no such report could exist: "[W]e run a school year from September to June and it would not have been feasible to anticipate his progress for the last marking period on May 16th." (Hr'g Tr. at 216.) We find no merit to plaintiffs' allegation that "the CSE did not reconvene to review or consider this data" (Complt. ¶ 33) because information on Z.V.'s progress and expected progress was presented to the CSE at the May 16 meeting. Accordingly, plaintiffs factual allegations are insufficient to amount to a procedural violation capable of depriving plaintiffs of meaningfully participating in the CSE meeting. *See Grim*, 346 F.3d at 381 (noting that not every procedural error "in the development of an IEP renders that IEP legally inadequate under the IDEA.").

### 2.  Measuring Progress

Plaintiffs also allege that the CSE failed to "measure progress in accordance with the criteria set forth in the IEP and by failing to notify the parents as to what criteria was actually to be applied." (Pls. Mem. Opp. Supp. Mot. Summ. J. at 8.) Plaintiffs take issue with the use of professional judgment to determine Z.V.'s level of mastery of predetermined goals, as well as the use of "'verbal

descriptions' and guessing" to develop goals and objectives for the 2003-04 IEP. (*Id.* at 8-9.)

As noted above, an IEP must include a "statement of measurable annual goals, including benchmarks or short-term objectives" and must describe how progress toward those goals will be measured and how the parents will be kept informed of such progress. 34 C.F.R. §§ 300.347(a)(2), (7). This includes "objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." *Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1401(a)(20) (current version at 20 U.S.C. § 1414(d)(1)(A)(i))). "In assessing children with disabilities, school districts may use a variety of assessment techniques to determine the extent to which these children can be involved and progress in the general curriculum, such as criterion-referenced tests, standard achievement tests, diagnostic tests, other tests, or any combination of the above." 34 C.F.R. Part 300, app. A, Question 1.

True, the transcript reveals that professional judgment was used in assessing Z.V.'s progress. Yet, we see no reason why this Court should second-guess the expertise of trained educators, especially where the SRO found the CSE also relied upon a mass of objective testing data. *See Watson*, 325 F. Supp. 2d at 144-45 ("Judges are not trained educators and are required to afford significant deference to State educational agencies' decisions . . . ."). Our own examination of the record shows that the CSE reviewed results from numerous tests and evaluations. In addition to the verbal test reports noted above, *supra* II.A.1., the CSE chairperson stated that the most recent administration of the Woodcock-Johnson was used to measure written language, reading and math abilities. (Hr'g Tr. at 41-44.) Z.V.'s speech/language therapist also conducted a battery of language and phonological tests to gain "a firm picture of [Z.V.'s] progress and his abilities," the results of which were reported to the CSE. (*Id.* at 443; Ex. 8; Ex. 4 at 5.)

In addition to the list of past test results contained in the IEPs, each IEP contained several pages of constantly revised goals listed under the "Measurable Annual Goals and Short-Term Objectives/Benchmarks" section. These goals listed specific percentages of mastery desired and described the method of evaluation, which included not only recorded teacher observations, but also standardized test scores. Bayer and Z.V.'s special education teacher, JeanAnn Tassone, both adequately explained the application of the percentages to Z.V.'s progress. (Hr'g Tr. at 223-33; 316-18; 336-38.) Therefore, "the CSE had sufficient current evaluative information with which to adequately identify progress and levels of performance, and to make needed adjustments to the students IEP goals and objectives." (SRO Op. at 7.)

### 3. Reliance on Improper Opinions

Plaintiffs also allege, based in large part on their theory regarding the lack of objective evidence, that the CSE relied on the improper opinions of Z.V.'s special education teacher in assessing Z.V.'s progress. (Pls. Mem. Opp. Supp. Mot. Summ. J. at 8.) The SRO determined that:

> the special education teacher gave specific examples of how she obtained input from the general education teacher when completing progress reports (Transcript p. 312), used charts to monitor and document work performed by the student (Transcript p. 316), and supplemented her reports of student progress on IEP objectives with anecdotal comments (Transcript pp. 312-15). She described a classroom clipboard she used to monitor the student's daily progress on assignments (Transcript p. 345), and explained that she checked off complete and incomplete assignments and documented this information in her grade book (Transcript p. 346). The special education teacher testified that she based assessment of progress on classroom tests and on work the student performed in the classroom (Transcript p. [350-51,] 360), and indicated that she kept "meticulous records" (Transcript p. 361).

(SRO Op. at 7-8.) An examination of the record compels us to agree with these findings and conclude that the special education teacher presented, and CSE relied upon, objective evidence.

## B.      Substantive Requirements

### 1.      Standard

Having determined that the District complied with the IDEA's procedural requirements, we turn to whether the IEP was reasonably calculated to confer educational benefits.   The Second Circuit has noted that the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP."  *Walczak*, 142 F.3d at 130.  "The Supreme Court, however, has specifically rejected the contention that the "'appropriate education' mandated by IDEA requires states to 'maximize the potential of handicapped children.'"  *Id.* (quoting *Rowley*, 458 U.S. at 197 n.21, 189).  Of course, the IEP must afford the opportunity for more than "trivial advancement."  *Id.* Accordingly, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression.'" *Cerra*, 2005 WL 2381962, at *7 (quoting *Walczak*, 142 F.3d at 130).

While the IDEA should not be interpreted to leave handicapped students "unprotected from substantively inadequate educational programs," *M.B.*, 2002 WL 389151, at *3, federal courts must avoid "impermissibly meddling in state educational methodology." *Walczak*, 142 F.3d at 130 (internal quotations omitted); *see also Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997) ("A court may not second-guess state educators' policy decisions in the effort to maximize a handicapped child's educational potential.").  Although federal courts conduct an independent review of the state agency's decision, this review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Rowley*, 458 U.S. at 206.  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary

'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206 (internal quotations omitted)).  Accordingly, deference to the state agency decision "is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 2005 WL 2381962, at *8; *see also M.S. ex rel. S.S.*, 231 F.3d at 105 ("An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where . . . the district court's decision was based solely on the record that was before the SRO.").  That said, "[f]or a federal court to conduct an 'independent' review of a challenged IEP without 'impermissibly meddling in state educational methodology,' it must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak*, 142 F.3d at 130 (internal citations omitted).

This Court's review is "necessarily prospective in nature"; therefore, we must not engage in "Monday-morning quarterbacking" influenced by our knowledge of Z.V.'s subsequent progress at Kildonan.[11]  *J.R.*, 345 F. Supp. 2d at 395.   Rather, we must consider the benefits to Z.V., if any, that the IEP afforded at the time it was devised.  *See id.*

## 2.    Appropriateness of the 2003-04 IEP

Plaintiffs argue that Z.V. was unable to benefit from his public education, evidenced by his

---

[11] The record contains hearing testimony and an affidavit from the Kildonan academic dean on Z.V.'s rapid progress at that specialized school.  That Z.V. benefitted from Kildonan does not mean that he would not have benefitted from the District's proposed 2003-04 IEP, "and the *ex post* information about [his] subsequent progress in private school is therefore irrelevant to the inquiry about whether the District's IEP was reasonably calculated to enable [him] to receive educational benefits" in the 2003-04 academic year.  *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 395 n.13 (S.D.N.Y. 2004) (Conner, J.).

declining standardized test scores and inability to meet grade-level expectations. (Pls. Mem. Opp. Supp. Mot. Summ. J. at 10.) They claim "the SRO failed to support his conclusions regarding likelihood of progress with any reference to objective evidence." (*Id.*) We disagree. The SRO opinion devoted four, full single-spaced pages to a detailed review of the evidence. (SRO Op. at 8-12.) Consequently, "[d]eference is particularly appropriate, when, as here, the state hearing officers' review has been thorough and careful." *Walczak*, 142 F.3d at 129.

Z.V. received passing marks each year and progressed from preschool to fifth grade in successive years in District schools. (Donegan Aff. ¶ 55.) Where a child is mainstreamed, "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak*, 142 F.3d at 130. Courts also look "to test scores and similar objective criteria even in cases where a disabled child has been educated in self-contained special education classes." *Id.* In this circumstance, the record must "be viewed in light of the limitations imposed by the child's disability." *Mrs. B.*, 103 F.3d at 1121.

There is a wealth of evidence indicating Z.V. made steady progress in his District education. The CSE chairperson, Z.V.'s special and regular education teachers and occupational and speech/language therapists all believed the 2003-04 IEP would continue this progress. (Hr'g Tr. at 192, 340, 383-84, 464, 469, 529; Ex. 4.) Coppola observed no change in Z.V.'s reading comprehension skills during his fourth grade regular education classes, but did see improvement in his writing and organizational skills. (Hr'g Tr. at 525.) She also believed that Z.V.'s attendance of regular education classes "provided support and modeled skills" that Z.V. could better learn in the regular class environment. (*Id.* at 529.) This went directly to building Z.V.'s confidence and motivation, an aspect of considerable concern and one addressed at length in the goals and objectives

section of the IEP. (*Id.* at 212, 332; Ex. 24 at 8; Ex. 4 at 9.) "Consistent with both home and school reports, it was noted that [Z.V.] needed encouragement to build confidence and motivation and that he benefitted from positive recognition of his strengths." (SRO Op. at 8.)

Tassone, Z.V.'s special education teacher for two years, recorded that Z.V. made progress in most areas and "was approaching proficiency at the grade level standards." (Hr'g Tr. at 336; Ex. A.) This included increases in sight word vocabulary, reading fluency and writing skill. She believed that given the additions to the IEP—such as calculator use, a modified behavioral plan, audio books and a keyboard program—Z.V.'s progress would continue. (Hr'g Tr. at 340-42.)

Her findings concerning Z.V.'s writing skills are consistent with Rutberg's impressions. Although Z.V. was making only "slow progress," he was "a great candidate" for occupational therapy. (Hr'g Tr. at 379, 384.) Z.V.'s legibility was improving and he moved from learning just manuscript to learning cursive, in which he was also making "slow progress." (*Id.* at 401, 404.) The motor skill goals and objectives were carried over from the 2002-03 IEP to the 2003-04 IEP (Ex. 4 at 9-10; Ex. 10 at 7) because the therapy was proving effective. (Hr'g Tr. at 380, 406-07.)

Kristin Angevine confirmed Z.V.'s progress in his speech/language ability as well. He made "steady progress" in phonological awareness and "progressed quite nicely" in auditory recall. (*Id.* at 437-38.) By the end of the 2002-03 school year, Z.V. had mastered four of the five goals set for that year. (Ex. A at 5.) These results were confirmed by subsequent reevaluative testing. (Ex. 8; Hr'g Tr. at 443-64.)

The CSE, confronted with objective testing data, *see supra* II.A., and the professional judgment of Z.V.'s experienced and certified teachers, concluded that Z.V. "had the capacity to handle and progress in some areas in the general education setting" and required special education

to continue to develop his reading, writing and math skills. (Hr'g Tr. at 152-53.) The 2003-04 IEP increased the reading goals to better address Z.V.'s decoding difficulties (*id.* at 245; Ex. 4 at 6-7) and added objectives to address Z.V.'s study habits, confidence and attentional difficulties. (SRO Op. at 8-11 (providing comparison of past and present objectives).) It also carried over and altered the testing modifications and assistive technology sections of the IEP to better suit Z.V.'s testing and learning needs. (Ex. 4 at 2; Hr'g Tr. at 157-63.) The CSE also provided in the IEP for a summer program to prevent any possible regression in Z.V.'s learning ability; plaintiffs refused Z.V.'s participation in the program. (Ex. 4 at 1, 5; Hr'g Tr. at 52-54.)

"Moreover, the emphasis on balance in the IEP between special education and mainstreaming is consistent with the IDEA's preference 'for disabled children to be educated in the least restrictive environment capable of meeting their needs.'" *Pascoe v. Washingtonville Cent. Sch. Dist.*, No. 96 Civ. 4926, 1998 WL 684583, at *6 (S.D.N.Y. Sept. 29, 1998) (quoting *Walczak*, 142 F.3d at 132). By keeping Z.V. in regular education courses for social studies, science, art, music and physical education, the District ensured that Z.V. would remain in school with his peers, which furthered the goal of improving Z.V.'s social and emotional maturation.

We agree with the SRO's finding that "the CSE consistently monitored [Z.V.'s] progress, obtained and considered additional evaluations as difficulties were identified, and incorporated recommendations from these evaluations into [Z.V.'s] IEP." (SRO Op. at 12; Hr'g Tr. at 47-48, 235, 267.) Consequently, we are compelled to defer to the SRO's decision that the District provided an IEP reasonably calculated to provide a free appropriate public education in compliance with the IDEA, thereby negating plaintiffs' entitlement to tuition reimbursement.

As plaintiffs themselves recognize, "[an] appropriate IEP means one that enables benefit."

(Pls. Mem. Opp. Supp. Mot. Summ. J. at 10.)  The IDEA guarantees an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotations omitted).  While we are sympathetic to the Violas' concerns, the evidence establishes that Z.V. was benefitting from his public education, even though he was not always performing to grade level.  Thus, we are compelled to conclude that the District met the minimum requirements of the IDEA even though Z.V. did not receive a "great education" or one addressing his disability in the "best way possible."  *M.B.*, 2002 WL 389151, at *9.  Now that the CSE has before it the report of Dr. Rissenberg confirming a diagnosis of dyslexia and recommending "a truly multisensory . . . instructional approach in a total immersion setting, such as a day school program for children with dyslexia" (Ex. 3 at 11), as well as the report of Brianne Seipp (Ex. B), Z.V.'s private summer tutor trained in teaching dyslexics, we assume that any future IEP for Z.V. will have to take this into account.[12]  *Cf. Arlington Cent. Sch. Dist. v. D.K.*, No. 02 Civ. 2117, 2002 WL 31521158, at *9 (S.D.N.Y. Nov. 14, 2002) (finding IEP was not reasonably calculated to confer educational benefits where parents had shown dyslexic child's need to receive Orton-Gillingham instruction and IEP "relied on these methods to only a limited extent").  We note that the District has arranged for Orton-Gillingham instruction in the past.  *See M.B.*, 2002 WL 389151, at *9.

---

[12] Orton-Gillingham is a specialized, multisensory teaching method designed to educate students with dyslexia and other learning disabilities.  *See M.B.*, 2002 WL 389151, at *3, 5.  We note that given the information before the CSE, it made attempts to address Z.V.'s learning disability by providing Orton-Gillingham-like instruction through the Wilson Reading Program.  (Hr'g Tr. at 779.)  Whether this will remain sufficient given the views expressed by Lane, Rissenberg and Seipp is open to consideration.  (*Id.* at 583, 828); *see M.B.*, 2002 WL 389151, at *5; *Evans*, 930 F. Supp. at 98-99.

## CONCLUSION

For all of the foregoing reasons, we affirm the decision of the State Review Officer that the 2003-04 individualized education plan in question, at the time it was formulated, complied with the procedural and substantive provisions of the Individuals with Disabilities Education Act. Accordingly, defendant Arlington Central School District's motion for summary judgment is granted, and Robert and Susan Viola's cross-motion for summary judgment is denied as moot.

SO ORDERED.

Dated: White Plains, New York
February 7, 2006

_William C. Conner_
Sr. United States District Judge